**COASTAL STATES MARKETING, INC. and Valero Energy Corporation, Plaintiffs-Appellants Cross-Appellees,**

v.

**Nelson Bunker HUNT, et al., Defendants-Appellees Cross-Appellants.**

No. 81–2303.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1983.

Rehearing and Rehearing En Banc
Denied Feb. 16, 1983.

Stephen D. Susman, William H. White, Robert E. Walls, Houston, Tex., for plaintiffs-appellants cross-appellees.

Vinson & Elkins, Harry M. Reasoner, Houston, Tex., Shank, Irwin, Conant, Williamson & Grevelle, A.B. Conant, Jr., Dallas, Tex., for N.B. Hunt, H. Hunt and L. Hunt.

Before RUBIN, RANDALL and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The issue is whether petitioning immunity[1] shields from antitrust scrutiny the defendants' pursuit of companies dealing in nationalized Libyan oil. The district court concluded that substantially all of the defendants' conduct was undertaken to obtain relief from courts in this country and abroad. The court, therefore, directed a verdict in defendants' favor at the close of the plaintiffs' case.

We have carefully reviewed the entire record. It is clear that the challenged conduct was, at least facially, undertaken to obtain judicial relief and that at least a substantial part of the defendants' purpose was to seek redress in the courts. We affirm because we agree that the pretrial stipulations, read in context with all of the evidence, precluded the plaintiffs from rebutting the immunity defense by showing that it was a sham.

---

1. Based on the Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United* *Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), this doctrine is now eponymously referred to as the *Noerr-Pennington* doctrine.

## I.

The Libyan Government granted Concession No. 65 to Nelson Bunker Hunt and his brothers [2] in 1957. The concession gave the Hunts, for fifty years, the exclusive right to "search for . . . bore for, and extract petroleum" from an area within the Province of Cyrenaica, Libya, and "to use, process, store, export and dispose of the same." In 1960, the Hunts assigned a fifty percent interest in the concession to BP Exploration Company (Libya) Ltd., a subsidiary of the British Petroleum Company, Ltd. (together referred to as BP).[3]

The Hunts and BP discovered oil in the concession area in 1961. They developed the find into the Sarir oil field and constructed a pipeline from the field to the Libyan coast. By 1967 they were exporting and marketing Sarir crude oil.

In 1971, the Libyan Government nationalized BP's interest in Concession No. 65, assigning it to the government-owned Arabian Gulf Exploration Company (AGEC). BP, of course, refused to accept the Libyan action. It published notices claiming title to Sarir crude in newspapers throughout the world. Its investigators traced the movement and sale of oil produced from the concession. It sent notices of its title claim to everyone suspected of dealing in Sarir crude. In addition, BP initiated twenty-nine lawsuits in various countries claiming

title to Sarir crude oil that had been exported by the Libyans.

In May 1973, the plaintiff, Coastal States, had contracted with Ashland Oil Company of California [4] and AGEC to purchase Sarir crude. Coastal made arrangements to process the oil at the Montedison refinery in Italy and began to market products refined from Sarir crude.

Sometime prior to June 1973, Don Harris, a BP employee, communicated with Sam Willson of Coastal.[5] Willson testified that Harris warned him against Coastal's involvement with Sarir crude. According to Willson, Harris stated that "BP would be doing everything in their power to hamper the fulfillment of any contract that was entered into for this crude."

In June 1973, the Libyan Government nationalized the Hunts' interest in Concession No. 65. The Libyans transferred this interest also to AGEC. Shortly after the nationalization, a BP director wrote to Nelson Bunker Hunt suggesting that they "join together in claiming ownership" to Sarir crude "or to take other joint action to protect our respective rights."

The Hunts initiated a worldwide campaign to notify crude oil users of their claim to Sarir crude.[6] Like BP, the Hunts tried to investigate the movement of Sarir oil from Libya. The Hunts also joined in twenty-one of the suits filed by BP claiming title to Sarir oil.

---

**2.** The concession was acquired originally by Nelson Bunker Hunt. He later assigned 12.5 percent interests to each of his brothers, Herbert and Lamar.

**3.** For a description of the agreement between the Hunts and BP (and the litigation that resulted therefrom), see *Hunt v. BP Exploration Co. (Libya) Ltd.*, 492 F.Supp. 885 (N.D.Tex.1980).

**4.** Ashland had also contracted with AGEC to buy Sarir crude. Coastal agreed to purchase the oil that Ashland was entitled to under that contract. Later, Coastal purchased all of the Sarir oil directly from AGEC.

**5.** At that time Coastal's name was Coastal States Gas Producing Co. The company later changed its name to Valero Energy Corp. and is still a party to this suit. Valero and Coastal States Marketing Co., the other plaintiff, are together referred to as "Coastal."

**6.** One notice entitled "ANNOUNCEMENT BY NELSON BUNKER HUNT" was sent to hundreds of crude oil users. The concluding paragraph of this document stated:

The attention of all those who may be concerned with these developments, whether as purchasers or sellers of oil, oil products, or otherwise, is drawn to the continuance of Hunt's rights. It is Hunt's intention to assert those rights wherever and whenever necessary against those who would infringe them, including anyone dealing in or with oil extracted from the Sarir Field, its products or proceeds. This warning applies equally to dealings in or with so-called "royalty oil" or "cost crude oil" of which there is none. Legal title to all oil from Sarir Field and Concession 65 rests in BP Exploration Company (Libya) Ltd. and Nelson Bunker Hunt.

The suits included a conversion action by the Hunts and BP against Coastal filed in the Texas state courts. Coastal counterclaimed for tortious interference with business relations. The counterclaim was based upon the same events as is the present suit. The state trial court denied both parties recovery, and the decision was affirmed in the state court of appeals and supreme court.[7]

Another legal skirmish between Coastal and the Hunts occurred in connection with an oil tanker, the S/T *Hilda*. The *Hilda* was chartered by Coastal to lift crude oil from the Montedison refinery to the east coast of the United States. She was scheduled to deliver the crude to Texaco Oil Co. in Boston. While the *Hilda* was en route, the Hunts informed Texaco that they intended to attach her cargo when she docked. As a result, Texaco informed Coastal that it would not accept crude oil from the *Hilda*.

Coastal then attempted to re-route the *Hilda* to another port. The Hunts tried to persuade the *Hilda*'s owner to order her to Boston in spite of Coastal's contrary instructions. They offered to indemnify the ship's owner for any damages incurred in doing so. Nevertheless, Coastal successfully re-routed the *Hilda* to Philadelphia. The Hunts then initiated federal court attachment proceedings against the *Hilda*'s cargo in a Pennsylvania federal district court. The suit, however, was dismissed for lack of jurisdiction.[8]

The campaign by the Hunts and BP to publicize their claims to Sarir oil also hindered Coastal's efforts to market that oil.

On several occasions the Hunts or BP communicated with crude oil users to inform them of the title dispute [9] while Coastal was trying to sell oil to them. There was evidence that these communications with Coastal's customers frustrated potential sales by Coastal. The publicity surrounding the *Hilda* incident, generated in part by a Hunt press release, also hampered Coastal's sales efforts.

Finally, Coastal's bankers refused to extend Coastal's credit so long as it continued to deal in Sarir crude. Coastal was the center of a controversy unrelated to the Sarir oil and the bankers did not want additional publicity concerning the company. Whether this fact raises an inference or is mere coincidence, two of the banks had employees of Standard Oil Company of Ohio (Sohio) on their board of directors. Sohio is owned in part by BP.

In August 1973, Coastal's economic condition forced it to assign its rights to purchase Sarir crude oil to another company. It contends that it lost millions of dollars of profits by assigning these rights. Moreover, Coastal claims that, because it did not have Sarir crude to be refined, it incurred penalties for failing to utilize reserved petroleum processing time at the Montedison refinery. Finally, Coastal seeks to recover the cost of re-routing the *Hilda* from Boston to Philadelphia.

This antitrust action was filed by Coastal in October 1974.[10] In November BP settled its dispute with the Libyan Government. As it was required to do by the settlement agreement, BP dismissed its suits asserting

---

**7.** *See Hunt v. Coastal States Producing Co.,* 570 S.W.2d 503 (Tex.Ct.Civ.App.1978), *aff'd,* 583 S.W.2d 322 (Tex.1979). Three justices dissented from the decision of the Texas Supreme Court.

**8.** *See Hunt v. A Cargo of Petroleum Products Laden on Steam Tanker Hilda,* 378 F.Supp. 701 (E.D.Pa.1974), *aff'd mem.,* 515 F.2d 506 (3d Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Coastal claims that the *Hilda* was not carrying Sarir crude. The Hunts claim that she may have been.

**9.** At least, the Hunts' ostensible purpose in communicating with the oil users was to notify them of the title dispute. Coastal contends that the communications were intended mainly to intimidate its potential customers. This dispute is addressed in more detail in section II(E), *infra.*

**10.** The suit was originally filed against the Hunts, British Petroleum Company Ltd. and its subsidiary, BP Exploration Company (Libya) Ltd. The district court granted the motion to dismiss filed by British Petroleum and BP Exploration on the ground that the court lacked jurisdiction over them.

title to the Sarir crude, including the Texas conversion action against Coastal. The Hunts, however, continued to prosecute their action against Coastal. In May 1975, they settled their dispute with Libya and then dismissed their other title suits.[11]

Coastal contends that the publicity and lawsuits initiated by the Hunts constituted a secondary boycott that sought to and did intimidate its potential customers and bankers. It seeks damages for this alleged conspiracy in restraint of the trade in Sarir crude pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1976). The Hunts filed a counterclaim seeking damages for Coastal's conversion of Sarir crude. The counterclaim is admittedly identical to the cause of action decided adversely to the Hunts in the Texas state courts.

Coastal moved for summary judgment with respect to the Hunts' counterclaim on the ground that the previous litigation of that claim in the Texas courts barred its relitigation in federal court. The district court granted this motion. The Hunts moved repeatedly for summary judgment on the antitrust claim, arguing in part that

all of their conduct was protected by the antitrust petitioning immunity.[12] The Hunts relied primarily upon four stipulations indicating that their "purpose" in instituting the investigations and litigation was to establish legal title to the expropriated Sarir crude oil.[13]

The Hunts' motions for summary judgment were denied and the case went to trial. Coastal presented evidence in an effort to show, among other things, that the Hunts initiated the litigation, publicity, and investigations in an effort to make Sarir crude unmarketable. In addition to the facts set forth above, Coastal introduced two documents prepared by one of Nelson Bunker Hunt's employees, G. Henry M. Schuler. One was a letter to the State Department requesting the text of an official protest sent by the United States to Libya in connection with the nationalization of the Hunts' interests. The letter indicated that the Hunts intended to litigate their claims to the oil, and concluded: "[i]t is at least possible that the Libyans will reconsider their belief that they can market expropriated oil without serious impedi-

---

11. The Hunts' motivation in dismissing these suits is disputed. Nelson Bunker Hunt testified that the litigation was dismissed only after foreign counsel advised that, considering the political climate prevailing during the OPEC oil embargo, the likelihood of prevailing in the suits was minimal. Coastal argues that the suits were dismissed after the Hunts' settlement with Libya because the litigation was never intended to be more than a means of pressuring Libya.

12. *See supra* note 1.

13. Included in a longer joint pretrial stipulation, the pertinent portions were as follows:
  17. Shortly after December 7, 1971, BP instituted an investigation the object of which was to identify persons and entities who might be dealing in, or interested in dealing in, Sarir crude or its products. The purpose of such investigation was to assist BP in contacting such persons or entities to give notice of BP's claim to ownership to Sarir crude, and to assist BP in filing and prosecuting litigation. Such investigation continued until sometime in 1974.
      *  *  *  *  *  *
  21. After December 7, 1971, BP Exploration Company (Libya) Limited filed 29 lawsuits

in various parts of the world. The purpose of each such lawsuit was an attempt to establish ownership of Sarir crude after the nationalization or expropriation.
      *  *  *  *  *  *
  30. Shortly after June 11, 1973, Nelson Bunker Hunt, acting for himself and his two brothers, instituted an investigation the object of which was to identify persons or entities dealing in or suspected of dealing in or being interested in dealing in Sarir crude or its products. The purpose of such investigation was to assist Nelson Bunker Hunt in contacting such persons or entities to give notice of his claim to ownership of Sarir crude and its products, and to assist him in the filing and prosecution of litigation.
      *  *  *  *  *  *
  33. After June 11, 1973, Nelson Bunker Hunt, acting for himself and his two brothers, filed 21 lawsuits in various parts of the world. All such suits were filed jointly with the BP Exploration Company (Libya) Limited. The object of each such lawsuit was an attempt to establish ownership of Sarir crude and its products after the expropriation or nationalization.

ment, in which case they may back-off their threat."

The other Schuler document was a discussion draft prepared in 1971 for a meeting of the London Policy Group, an organization of oil company representatives that met to discuss a joint response to OPEC. The document discussed possible responses to tax legislation being considered by Libya. One measure proposed was a public relations campaign to: "Emphasize the clear terms of our concession agreements—this is very important because it is only way to counter the argument above [sic] sovereignty in tax matters. Make it clear to all that we intend to frustrate the sale of pirated oil."

Coastal also called as witnesses Nelson Bunker Hunt and Lamar Hunt. They were asked, among other things, about their intent in initiating the title litigation. Nelson Bunker Hunt stated several times that he intended solely to establish legal title to the Sarir oil. Only once did he indicate any other motive for the litigation.[14] Lamar Hunt testified that the Hunts' actions were taken to prevent the sale of Sarir oil without compensation to the Hunts.[15]

At the close of Coastal's evidence, the trial court granted the Hunts' motion for a directed verdict on the ground that the Hunts' conduct was protected by petition-

ing immunity. Coastal now appeals that ruling. The Hunts cross-appeal the summary judgment entered on their counterclaim.

## II.

### A. Petitioning Immunity.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961),[16] and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965),[17] the Supreme Court established the basic principle of antitrust petitioning immunity, that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593, 14 L.Ed.2d at 636. In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court extended petitioning immunity to joint efforts to influence adjudicative bodies. These decisions assure "uninhibited access to government policy makers," whether they be legislative, executive, or judicial. *George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 32 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d

---

**14.** Q: Isn't it true, sir, that in making such warnings or threats it was your purpose to prevent people from dealing in Sarir crude or products refined from Sarir crude?
A: No, not—partially, I guess you would say. Actually we were requested by the State Department to do it, and they were anxious to protect the validity of these contracts and so that had something to do with it, with our actions.

**15.** Q: Isn't it true, Mr. Hunt, that whatever Bunker Hunt and the legal counsel did, with your general authority, was done to further your desire that nobody buy oil, Sarir oil, from Libya, and nobody be able to buy oil or buy products refined from Sarir oil?
A: Without our being compensated? Certainly. We are not interested in seeing our oil sold without our being compensated, as our contract called for, and that was our purpose, that and to protect our interest, whatever it might be under the then shaky circumstances of the Libyan government at that time.

**16.** *Noerr* involved a suit by a group of trucking companies against a group of railroads for conspiracy to restrain trade and monopolize the long-distance freight business. The trucking companies charged that the railroads had, through a third party, conducted a publicity campaign designed to foster the adoption of legislation unfavorable to the truckers and to injure the truckers' public reputations and customer relations. Noting the "essential dissimilarity" between this conduct and that traditionally condemned by the Sherman Act, 365 U.S. at 136, 81 S.Ct. at 529, 5 L.Ed.2d at 470, the Court held that the Sherman Act did not reach the railroads' conduct. *Id.*

**17.** In *Pennington,* large coal operators, working with union officials, allegedly conspired to drive smaller coal operators out of business by attempting to persuade the Secretary of Labor to set a higher minimum wage for companies selling coal to the TVA.

88 (1967). The basic question raised by Coastal's appeal is whether this doctrine immunizes the Hunts' challenged conduct from antitrust scrutiny.

### B. Boycotts.

■ Coastal first argues that petitioning immunity does not extend to boycotts.[18] The argument is without merit. In *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 542–43 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), petitioning immunity shielded certain acts of doctors that allegedly constituted a boycott of a Florida abortion clinic.[19] Indeed, the conduct charged in *Noerr* itself, a publicity campaign designed in part to "impair the relationships existing between the truckers and their customers," 365 U.S. at 129, 81 S.Ct. at 525, 5 L.Ed.2d at 466, could be characterized as a secondary boycott. The mere fact that a boycott forms a part of the petitioning conduct does not vitiate the immunity of such conduct.

### C. Petitioning Foreign Governments.

■ Coastal argues that, because petitioning immunity is based solely upon the first amendment right to petition, it does not apply to litigation brought in foreign courts.[20] We note initially that Coastal failed to raise this argument before the district court. As a general principle of appellate review, we refuse to consider issues not raised below. *Delesdernier v. Porterie,* 666 F.2d 116, 124–25 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); *Jackson v. United States Postal Service,* 666 F.2d 258, 260–61 (5th Cir.1982). Judicial economy is served and prejudice avoided "by binding the parties to the facts presented and the theories argued below." *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1144 (5th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Bliss v. Equitable Life Assurance Society,* 620 F.2d 65, 70 (5th Cir.1980).

There is, however, an exception to this general rule when a pure question of law is involved and a refusal to consider it would result in a miscarriage of justice. *Holiday Inns, Inc. v. Alberding,* 683 F.2d 931, 933 (5th Cir.1982). The foreign application of petitioning immunity presents such a naked question. In addition, Coastal has a colorable argument that our refusal to consider the argument would be unfair. We, therefore, will address it.

■ Nonetheless, we find the argument to be without merit. Petitioning immunity reflects not only first amendment concerns but also a limitation on the scope of the Sherman Act.

*Noerr* was based on a construction of the Sherman Act.[21] It was not a first amend-

---

18. Coastal contends that the Hunts' lawsuits and publicity constituted a secondary boycott because they were designed to discourage Coastal's customers from purchasing Coastal's crude oil and refined oil products. *Cf. McBeath v. Inter-American Citizens for Decency Comm.,* 374 F.2d 359, 362 (5th Cir.), *cert. denied,* 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967) (adverse publicity designed to discourage publisher's advertisers constituted secondary boycott).

19. *Accord Gambrel v. Kentucky Bd. of Dentistry,* 689 F.2d 612, 620–21 (6th Cir.1982) (boycott of dental laboratories); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1200–03 (8th Cir. 1982) (litigation constituting secondary boycott of milk distributor); *Federal Prescription Serv., Inc. v. American Pharm. Ass'n,* 663 F.2d 253 (D.C.Cir.1981) (boycott of mail order pharmaceutical companies), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

20. In *Industrial Ind. Dev. Corp. v. Mitsui & Co.,* 671 F.2d 876, 882 n. 6 (5th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3099 (U.S. July 30, 1982) (No. 82–178) we noted, but did not decide, the question concerning the extent to which petitioning immunity extended to communications with foreign governments.

21. The Court stated "we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." 365 U.S. at 138, 81 S.Ct. at 530, 5 L.Ed.2d at 471.

Although the Court did not mention it, there is support in the legislative history of the Sherman Act for the *Noerr* decision. Senator Sherman stated during debate that the Act "does not interfere in the slightest degree with voluntary associations made to affect the public

ment decision.[22] While the Court's opinion in *California Motor Transport* stressed the first amendment underpinnings of petitioning immunity,[23] we do not view that opinion as overruling. *Noerr*'s clear holding that the Sherman Act simply does not extend to joint efforts to influence government officials.[24]

The Court's decision in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 1414–15, 8 L.Ed.2d 777, 788 (1962), at least implies that petitioning immunity applies to joint efforts to influence foreign governments. The complaint in that case charged the defendant with conspiracy to restrain and monopolize vanadium trade in the United States. The defendants' Canadian subsidiary had been appointed by the Canadian Government as exclusive wartime agent to buy vanadium for Canadian industry. The plaintiff claimed that, through this agency, the defendants refused to purchase plaintiff's vanadium.

The Ninth Circuit, citing *Noerr,* said, "we do not see how such efforts as appellants claim defendants took to persuade and influence the Canadian Government through its agent are within the purview of the Sherman Act." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 289 F.2d 86, 94 (9th Cir.1961), *rev'd,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). The Supreme Court reversed, but not because petitioning immunity did not extend to communications with foreign governments. Instead, the Court ruled that *Noerr* did not apply when the contacts with the foreign government are commercial rather than political. 370 U.S. at 707–08, 82 S.Ct. at 1414–15, 8 L.Ed.2d at 788.

We recognize that the *Continental Ore* decision did not directly address the applicability of petitioning immunity when foreign sovereigns are involved. Nevertheless, the fact that the Court distinguished *Noerr* on factual grounds instead of simply holding it inapplicable does support our conclusion that petitioning immunity is not limited to the domestic political arena.[25]

---

opinion to advance the interests of a particular trade or association." 21 Cong.Rec. 2562 (1890). *See generally Missouri v. National Org. for Women, Inc.,* 620 F.2d 1301, 1304–09 (8th Cir.), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980) (discussion of legislative history as it relates to petitioning immunity).

**22.** Indeed, the Court expressly declined to decide whether the railroads' conduct was protected by the first amendment, stating that it was unnecessary to resolve that issue "[b]ecause of the view we take of the proper construction of the Sherman Act." 365 U.S. at 132 n. 6, 81 S.Ct. at 526–27 n. 6, 5 L.Ed.2d at 468 n. 6.

**23.** We conclude that it would be destructive of rights of association and petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitor. 404 U.S. at 510–11, 92 S.Ct. at 612, 30 L.Ed.2d at 646. We have also stressed the first amendment considerations at work in the petitioning immunity. *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 542 (5th Cir. 1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979).

**24.** Many of the Supreme Court's later decisions re-affirm the conclusion that *Noerr* was based upon a construction of the Sherman Act. *N.A.A.C.P. v. Claiborne Hardware Co.,* —— U.S. ——, ——, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 399, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364, 374 (1978); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 601, 96 S.Ct. 3110, 3123, 49 L.Ed.2d 1141, 1155 (1976). The Eighth Circuit's decision in *Missouri v. National Org. for Women, Inc.,* 620 F.2d 1301 (8th Cir.), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980), applies petitioning immunity as a matter of statutory construction.

**25.** *See* Antitrust Division, United States Dep't of Justice, Antitrust Guide for International Operations 63 (Jan. 26, 1977) (Case N), *reprinted in* 799 Antitrust & Trade Reg.Rep. (BNA) at E–1, E–18 (Feb. 1, 1977); Davis, *Solicitation of Anticompetitive Action from Foreign Governments: Should the Noerr-Pennington Doctrine Apply to Communications with Foreign Sovereigns?,* 11 Ga.J.Int. & Comp.L. 395, 419–20 (1981); Graziano, *Foreign Governmental Compulsion As a Defense in United States Antitrust Law,* 7 Va.J.Int.L. 100, 132 (1967). *But see* Note, *Corporate Lobbyists Abroad: The Extraterritorial Application of Noerr-Pennington Antitrust Immunity,* 61 Cal.L.Rev. 1254, 1269

Only one case addresses the question directly. In *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92 (C.D. Cal.1971), *aff'd per curiam on other grounds,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972), the plaintiff had obtained from an Arab sheikdom a concession to exploit offshore oil deposits. Plaintiffs charged that the defendants induced a neighboring Arab sheikdom and Iran to assert competing territorial claims to the offshore area, thereby interfering with plaintiffs' efforts to exploit their concession.

The district court held that petitioning immunity did not apply to the defendants' conduct. The court noted that *Noerr* rested on the first amendment and on the need for a representative democracy to keep in touch with its constituents. But, it reasoned, "the constitutional freedom to petition the government carries limited if any applicability to the petitioning of foreign governments." *Id.* at 107. Moreover, the court thought that "the persuasion of the Middle Eastern states alleged in the present case is a far cry from the political process with which *Noerr* was concerned." *Id.* at 108.[26]

The Justice Department takes the position that petitioning immunity applies to efforts to influence foreign governments. Antitrust Division, United States Department of Justice, Antitrust Guide for International Operations 63 (Jan. 26, 1977) (Case N), *reprinted in* 799 Antitrust & Trade Reg. Rep. (BNA) at E–1, E–17, E–18 (Feb. 1, 1977). Commentators are divided.[27]

We are, of course, not bound by *Occidental Petroleum* and we decline to follow it.[28] We reject the notion that petitioning immunity extends only so far as the first amendment right to petition and then ends abruptly. The Sherman Act, as interpreted by *Noerr,* simply does not penalize as an antitrust violation the petitioning of a government agency. We see no reasons why acts that are legal and protected if done in the United States should in a United States court become evidence of illegal conduct because performed abroad. We also reject the idea that the availability of

(1973) (since *Continental Ore* did not reach *Noerr* question, no implications can be drawn).

**26.** The Ninth Circuit held that the defendants' actions were immunized by the act-of-state doctrine. It therefore did not reach the *Noerr* question. *Occidental Petroleum Corp. v. Buttes Oil & Gas Co.,* 461 F.2d 1261 (9th Cir.) (per curiam), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).

**27.** Professor Areeda agrees that petitioning immunity extends to foreign communications. 1 P. Areeda, Antitrust Law ¶ 239, at 104–05 (Supp.1982); *accord* Davis, *supra* note 25. *Contra,* Fishel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 120–21 (1977); McManis, *Questionable Corporate Payments Abroad: An Antitrust Approach,* 86 Yale L.J. 215, 290 (1976). Other commentators acknowledge the difficulty of applying petitioning immunity to foreign communications as a constitutional matter but advocate its extension for other reasons. *See* B. Hawk, Common Market and International Antitrust: A Comparative Analysis 144–48 (1979) (consistency with act-of-state doctrine; needs of American firms overseas); Fugate, *The Department of Justice's Antitrust Guide for International Operations,* 17 Va.J. Int'l L. 691, 693 (1977) (what companies can do domestically they should be able to do over-

seas); Note, *Corporate Lobbyists Abroad: The Extraterritorial Application of Noerr-Pennington Antitrust Immunity, supra* note 25, at 132 (international comity and good foreign relations).

**28.** Other cases that have involved foreign petitions are of little further assistance. In *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. 1100, 1155–57 (E.D.Pa.1981), the court ruled that petitioning immunity protected the defendants from antitrust liability for joint solicitation of the Japanese and United States Governments. The court, however, did not discuss the extraterritorial application of petitioning immunity. Similarly, in *United States v. Amax,* 1977 Trade Cas. (CCH) ¶ 61,467 (N.D. Ill.), the court held that petitioning immunity did not bar an antitrust suit for conduct undertaken with the approval of the Canadian Government. That ruling appears to be based on the fact that the Canadians were not petitioned; instead, they merely expressed approval. The court, however, did not discuss the extent to which petitioning immunity applied. In *Platt Saco Lowell Ltd. v. Spindelfabrik Suessen-Schurr,* 1978–1 Trade Cas. (CCH) ¶ 61,898 (N.D.Ill.1977), the court seemed to apply petitioning immunity to German litigation. It did not, however, discuss the issue.

petitioning immunity turns on the political "persuasion" of the government involved.[29] The political character of the government to which the petition is addressed should not taint the right to enlist its aid.

### D. Threats of Litigation

■ Coastal argues that the Hunts' well-publicized threat to litigate wherever and whenever necessary to assert their claim to Sarir crude is not immunized petitioning. The first basis for this contention is that, because threats of litigation are not directed to a government, they do not fall within the rationale of petitioning immunity. The argument is without merit.

Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute. This is the position taken by most of the courts that have considered the question.[30]

The Hunts contended below that they initiated the publicity and threats upon the advice of counsel to prevent subsequent purchasers of the crude from taking without notice of the Hunts' claims. In the usual case, Coastal would have the opportunity to rebut this contention by showing that the proffered justification fell within the "sham" exception to petitioning immunity. In this case, however, as we discuss in the next section, Coastal's stipulations and the absence of substantial evidence to the contrary preclude a finding of sham. We, therefore, find that the publicity and threats of litigation were protected by petitioning immunity.[31]

Coastal also argues, citing Professors Areeda and Turner, that, for the Hunts to establish that the threats and publicity were protected, they must show that the conduct was *indispensable* to the litigation. Areeda and Turner do use that term, but they also explain, "we do not mean to suggest that courts should try to make very refined judgments about what [sort of conduct] is 'unnecessarily harmful.' We merely mean to leave a safety route for condemning highly anticompetitive activities

---

**29.** Professor Areeda once took the position that petitioning immunity extended only to efforts to influence "democratic" governments. P. Areeda, Antitrust Analysis ¶ 192, at 130 (2d ed. 1974). His most recent writings on the subject, however, criticize the *Occidental Petroleum* decision on this precise ground: "the court [in *Occidental*] seems wrong, however, because every government, whether representative or not, is privileged to set the terms on which persons within its borders may seek its legislation, decrees, or other sovereign action." 1 P. Areeda & D. Turner, Antitrust Law ¶ 239, at 174–75 (1978).

**30.** *See Pennwalt Corp. v. Zenith Labs., Inc.,* 472 F.Supp. 413, 424 (E.D.Mich.1979) (alternative holding), *appeal dismissed mem.,* 615 F.2d 1362 (6th Cir.1980); *Outboard Marine Corp. v. Pezetel,* 474 F.Supp. 168, 174 (D.Del.1979); *Clairol, Inc. v. Boston Discount Ctr. of Berkeley, Inc.,* 1976–2 Trade Cas. (CCH) ¶ 61,108 (E.D.Mich.), *aff'd on other grounds,* 608 F.2d 1114 (6th Cir.1979).
*Alexander v. National Farmers Org.,* 687 F.2d 1173, 1200 (8th Cir.1982), is not contrary to our holding. While the court there found certain threats of litigation unprotected, it did so only because it found that the litigation was a

"sham." The court expressly distinguished "circumstances in which actions against a competitor's customers are in good faith." *Id.* at 1200.
We decline to follow *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.,* 460 F.Supp. 1359, 1386 (D.Haw.1978), to the extent that it holds threats of litigation directed to a competitor's customers to be *per se* unprotected. There is no precedent for that decision.

**31.** *Mid-Texas Communications Sys. v. AT&T,* 615 F.2d 1372 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980), cited by Coastal on this point, is simply inapposite. In that case AT&T refused to interconnect a competitor's telephone exchanges and claimed the immunity on the ground that its refusal to act was a necessary first step to bringing the dispute to a government agency. The court held that this was not directed toward any government agency and was not an attempt to influence government action. Here, on the contrary, the Hunts did invoke governmental judicial aid. The question is whether the declaration that they would do so and the publicity initiated by them were ancillary to that petition.

that are not justified by the necessities of political life." 1 P. Areeda & D. Turner, Antitrust Law ¶ 205, at 52 (1978). If litigation is in good faith and not sham, such a "safety route"[32] need not be provided, for it merely injects another uncertainty into an already complex problem without providing any more useful test for determining when anticompetitive conduct is unprotected.

### E. The Sham Exception

In *Noerr*, the Court noted that immunity would not extend to conduct ostensibly directed toward influencing the government but which is in fact "a mere sham to cover what is nothing more than an attempt to interfere directly with business relationships of a competitor ..." 365 U.S. at 144, 81 S.Ct. at 533, 5 L.Ed.2d at 475. Coastal contends that the Hunts were engaged in just such a sham.

In *California Motor Transport*, the Court considered a complaint alleging, *inter alia*, that a group of motor carriers brought administrative actions in an effort to eliminate a competitor by frustrating its efforts to obtain operating rights. The Court held that this stated a cause of action under the sham exception. Two years later, the Court summarily affirmed a district court's finding that an electric company's use of litigation principally to prevent the establishment of competing municipal power systems came within the sham exception. *United States v. Otter Tail Power Co.*, 360 F.Supp. 451, 451 (D.Minn.1973), *aff'd mem.*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).[33]

■ The district court found that Coastal's stipulations precluded a finding that the Hunts' litigation was a sham intended not to obtain judicial relief but instead merely to conceal anticompetitive wolfing in sheep's clothing. The stipulations state that the Hunts' purpose in investigating who was dealing in Sarir crude, contacting those persons, and instituting the litigation was to establish ownership of the Sarir crude.[34] Coastal argues that the district court improperly construed the stipulations, should have set them aside if they were properly construed, and that a sham exception case could have been made notwithstanding the stipulations. For the reasons set forth below, we agree with the district judge.

We have previously declined, absent an abuse of discretion, to "disturb the district court's interpretation of a stipulation agreed upon by the parties during pretrial proceedings and approved by the court." *Risher v. United States*, 465 F.2d 1, 5 (5th Cir.1972); *Hodges v. United States*, 597 F.2d 1014, 1017 (5th Cir.1979). That is the course we adopt in this case. The district court is in a better position to determine the intent of the parties to the stipulation. Moreover, appellate *de novo* review of the trial court's construction would defeat the underlying purpose of pretrial proceedings, *i.e.*, defining and limiting the issues for trial. *Hodges*, 597 F.2d at 1017. The district court's construction cannot be characterized as arbitrary. We, therefore, decline to disturb it.

The stipulations cannot easily be construed to cover all of the conduct at issue here. By their terms, they address only the litigation and investigations into who was dealing in Sarir oil. Much of the Hunts' and BP's conduct, including the publicity

---

**32.** We also reject Coastal's contention that the Hunts' notices claiming title to Sarir crude were unprotected because they were misleading. Again, the argument was not raised below as defeating the application of petitioning immunity. *See* discussion at p. 1364, *supra*. Moreover, the publicity makes clear that it states only the Hunts' claims concerning the Sarir crude. We, therefore, reject Coastal's argument that the publicity is misleading because it states without qualification that the Hunts had title to the oil.

**33.** In *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n. 6, 97 S.Ct. 2881, 2889 n. 6, 53 L.Ed.2d 1009, 1019 n. 6 (1977), the Court stated that *California Motor* and *Otter Tail* together "may be cited for the proposition that repetitive sham litigation ... may constitute an antitrust violation."

**34.** *See supra* note 13.

claiming title and the direct contacts with Coastal's customers, is at first glance beyond the scope of the stipulations.

We have, therefore, carefully considered the stipulations in the context of all the evidence adduced below. We requested supplemental briefs as to the evidence of sham. Our review of the record convinces us that the district court did not act arbitrarily in holding that all of the challenged conduct was within the scope of the stipulations. The stipulations establish that the litigation itself was brought in sufficient good faith to bring it within the protection of petitioning immunity. It would be anomalous to hold that, while the litigation was in good faith, the publicity and warnings preceding it were not. While the district court did not discuss the application of the stipulations to each separate type of conduct, we believe that this was the basis of its ruling.

The one exception is the press release issued after the *Hilda* incident. This conduct was clearly beyond the scope of the stipulations. We agree with the district court, however, that this was *de minimis*.

Coastal argues that, if the district court correctly construed the stipulations, it erred in refusing to grant Coastal relief from them. Fed.R.Civ.P. 16 provides that a pretrial order "when entered controls the subsequent course of the action, unless modified at trial to prevent injustice." The trial

judge has "broad discretion in determining whether or not a pretrial order should be modified or amended." *United States v. Texas,* 680 F.2d 356, 370 (5th Cir.1982); accord *Del Rio Distributing, Inc. v. Adolph Coors Co.,* 589 F.2d 176, 178 (5th Cir.1979), cert. denied, 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1980).[35]

Nevertheless, we have recognized that the trial court has not only the right but the duty to relieve a party from a pretrial stipulation "where necessary to avoid manifest injustice and adjudications based on the sporting theory," *United States v. Texas,* 680 F.2d at 370; *Central Distributors, Inc. v. M.E.T., Inc.,* 403 F.2d 943, 945 (5th Cir.1968),[36] or where there is substantial evidence contrary to the stipulation. *Donovan v. Hamm's Drive Inn,* 661 F.2d 316, 317 (5th Cir.1981); *Loftin & Woodard, Inc. v. United States,* 577 F.2d 1206, 1232 (5th Cir.1978). Moreover, stipulations couched in conclusory terms are entitled to less deference than those couched in evidentiary terms. *United States v. Texas,* 680 F.2d at 370; *Aetna Life Insurance Co. v. Barnes,* 361 F.2d 685, 690 (5th Cir.1966).

We cannot conclude that the district court abused its broad discretion in holding Coastal to its stipulations. We have carefully reviewed the entire record and cannot find substantial evidence contradicting the stipulations.[37] Indeed, there was substantial evidence that was consistent with the

---

**35.** *Accord Sherman v. United States,* 462 F.2d 577, 579 (5th Cir.1972); *Henry v. Commissioner,* 362 F.2d 640, 643 (5th Cir.1966).

**36.** *Accord Donovan v. Hamm's Drive Inn,* 661 F.2d 316, 317 (5th Cir.1981); *Loftin & Woodard v. United States,* 577 F.2d 1206, 1232 (5th Cir. 1978); *Associated Beverages Co. v. P. Ballantine & Sons,* 287 F.2d 261, 263 (5th Cir.1961). Coastal's reliance on *Wallin v. Fuller,* 476 F.2d 1204, 1209–10 (5th Cir.1973), is misplaced. *Wallin* involved the modification of a pretrial order to reflect an issue that the parties had, by implication, consented to try. The Hunts cannot be said to have consented to trying the issue of intent in this case. Throughout the trial, the Hunts argued that the stipulations were dispositive of the petitioning immunity issue. The fact that they did not rely solely upon the stipulations after the district court denied their motions for summary judgment does not constitute implied consent.

**37.** There was some evidence from which a jury might have inferred bad faith on the Hunts' part. The number of lawsuits filed without success is itself circumstantial evidence of sham. *See Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1257 (9th Cir.1982). So is the fact that the suits were dismissed after the Hunts settled with Libya. *See Alexander v. National Farmers Org.,* 687 F.2d 1173, 1202 (8th Cir.1982). In addition there were the two Schuler memoranda, the conduct of BP, and the Hunts' testimony. Nevertheless, after reviewing this evidence along with the entire record we are unconvinced that the showing of sham was so substantial as to require a finding that the district court abused its discretion.

We do not, of course, hold that absent the stipulations the evidence would have been insufficient to present a jury question as to sham. In light of our view that the stipulations pre-

stipulations: the Hunts' testimony, the testimony of their counsel, Mr. Lauterpacht, and the fact that most of the conduct in question reflected the normal course of litigation. We also note that the Texas state courts, faced with at least one of the suits at issue, found the part of the Hunts' conduct that came before them to be justified. *Hunt v. Coastal States Gas Producing Co.,* 570 S.W.2d 503, 510–11 (Tex.Civ.App.1978), *aff'd,* 583 S.W.2d 322, 326 (Tex.1979). We must, therefore, consider whether a manifest injustice resulted from the district court's failure to grant Coastal relief from the stipulations.

Coastal argues that it is manifestly unfair to hold it to stipulations contrary to its basic theory of the case. We agree with the district court that this scenario simply does not describe the events. Early in the case, Coastal took the position that petitioning immunity simply did not apply to the facts of the case. The sham exception was mentioned, if at all, only as a weakly asserted alternative argument.[38] By March 1981, Coastal's theory of the case had shifted. Instead of arguing that petitioning immunity was wholly inapplicable, Coastal argued that the immunity did not apply if *an* ulterior motive to restrain trade could be shown.[39] The Hunts' intent in prosecuting the suits nonetheless continued to be an issue.[40] The record excerpts cited above, however, convince us that this resulted from Coastal's "ulterior motive" theory and not its assertion of the sham exception.

In the briefs filed in this appeal, Coastal for the first time asserted the sham excep-

clude a finding of sham, we need not reach that question.

**38.** In "Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment," filed Sept. 28, 1978, for example, Coastal's main argument was that petitioning immunity simply did not apply to the *per se* violation alleged in this case. In three conclusory sentences, Coastal asserted the sham exception as an alternative argument. Coastal vigorously opposed the Hunts' motion for a hearing to determine the validity of the nationalization of the Sarir under Libyan and international law. Coastal argued that this law was irrelevant because the Hunts could not assert a defense based upon a good-faith belief that they had title to the oil. *See* "Further Response of Coastal States Gas Producing Company and Coastal States Marketing, Inc. to Defendants' Motion to Determine Foreign Law," filed June 5, 1979, and "Plaintiff's Opposition to Defendants' Request for a Hearing to Determine Foreign and International Law," filed November 21, 1980.

On December 1, 1980, Coastal filed a memorandum in opposition to the Hunts' renewed motion for summary judgment. The document stated that "The Sherman Act regulates market and price behavior without regard to the purpose or intent of those tampering with them." The sham argument is, somewhat inconsistently, asserted as an alternative argument. On February 18, 1981, Coastal's motion *in limine* asked that the Hunts be ordered not to introduce evidence showing (1) that the nationalization of the Sarir was invalid; (2) the Hunts' belief that they had title to the oil; or (3) foreign or international law with respect to title to the crude oil. The motion stated "if the Hunt brothers' action violated the antitrust laws of the United States, those actions cannot be justified by good motive ..."

**39.** Thus, in a brief filed March 3, 1981, concerning the admissibility of evidence of the Texas litigation, Coastal argued that it did not have to show sham but only that the suits were filed in furtherance of a conspiracy to restrain trade. Similarly, in Coastal's "Plaintiff's Objections to Defendants' Jury Instructions and Requested Interrogatories," filed March 12, 1981, its position was: "In sum, the Plaintiffs in this case have no burden to show that lawsuits initiated by the Defendants were without probable cause or were filed with a total disregard of the merits. Plaintiffs need only show (1) that the Defendants had an ulterior purpose in filing lawsuits and (2) other activities of the Defendants, apart from those incidental to the lawsuits themselves, support the claim of abuse of process." In their memorandum resisting the Hunts' motion for a directed verdict, filed March 13, 1981, Coastal stated that "all that the plaintiffs must show is that the lawsuits were filed for an ulterior purpose of restraining trade in Sarir oil and that they have committed other acts, apart from those incidental to the lawsuits themselves."

**40.** The pretrial order listed as a contested issue of fact whether the Hunts' actions were a sham, presumably reflecting the fact that the sham exception had been formally asserted as an alternative argument. This reference to the exception does not convince us that the district court incorrectly perceived Coastal's main theories at trial any more than do the summary assertions of the sham exception in the pleadings.

tion as a major theory of the case. It, therefore, does not seem to us unjust to hold Coastal to the stipulations at least to the extent that they establish that the Hunts were genuinely motivated, at least in part, by hope of obtaining judicial approval of their claims to title to Sarir crude.[41]

The ultimate question presented by this appeal, then, is whether Coastal could have established the sham exception [42] sufficiently to present a jury question on that issue after stipulating that the Hunts' conduct was motivated in part by a genuine desire for judicial relief. The answer to that question is "no."

The Supreme Court has never defined with precision the standard for determining when litigation is a sham. The usual litigant will base its decision to sue on a number of factors. Some of these considerations may be anticompetitive. Others may involve a genuine desire for judicial relief or a desire to induce a better settlement than can be obtained without such leverage. The "sham" standard must account for the existence of multiple motivations.

*Otter Tail* suggests a "principal purpose" test. The Supreme Court there affirmed summarily the district court's finding that litigation came within the sham exception because it was "designed principally" for anticompetitive purposes. *United States v. Otter Tail Power Co.,* 360 F.Supp. 451, 451–52 (D.Minn.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). The Court has made it clear, however, that a summary affirmance implies approval not of the reasoning but only of the result below. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 500, 101 S.Ct. 2882, 2888, 69 L.Ed.2d 800, 810 (1981); *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199, 204 (1977) (per cu-

---

**41.** It is not entirely clear that Coastal disputes this fact even on appeal. Coastal's brief asserts only that the evidence below reasonably supported a finding that "the *principal* purpose of any litigation filed in the United States was to discourage the marketing of Sarir crude ..." (emphasis added). Coastal thus seems to claim only that anticompetitive motives predominated. Such a finding would not preclude a finding that the Hunts genuinely desired judicial relief.

**42.** We use the "sham exception" in this opinion to refer to the exception to petitioning immunity arising from a lack of a significant intent to influence the government. There are other exceptions to petitioning immunity, also referred to as "sham" exceptions, which are not relevant here.

This is not, for example, an "overall scheme" case. This exception to petitioning immunity dates at least from *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). The theory of these cases is that good faith, even successful, litigation brought in furtherance of an "overall scheme" to violate the antitrust laws is not entitled to immunity.

Each of the cases applying the "overall scheme" theory involved circumstances unlawful even apart from the litigation. Thus, in *Kobe* and *Dairy Foods Inc. v. Dairy Maid Prods. Corp.,* 297 F.2d 805 (7th Cir.1961), the litigation was brought against infringers of unlawfully pooled patents. Other cases involved unlawful patent licensing agreements, *United States v. Singer Mfg. Co.,* 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); *Clapper v. Origi-*

*nal Tractor Cab Co.,* 270 F.2d 616 (7th Cir. 1959), *cert. denied,* 361 U.S. 967, 80 S.Ct. 592, 4 L.Ed.2d 547 (1960). In one case challenges to tariffs were made in an effort to maintain a conspiracy to fix prices and allocate the relevant market among the conspirators, *Clipper Exxpress v. Rocky Mtn. Motor Traffic Bur.,* 690 F.2d 1240, 1263–65 (9th Cir.1982). In another, litigation was used to maintain an unlawful tying arrangement. *Rex Chainbelt, Inc. v. Harco Prods., Inc.,* 512 F.2d 993 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975).

Overall scheme may have been one of the theories Coastal proceeded upon in the court below. It is not, however, urged on appeal. Moreover, there is no record evidence supporting the existence of any overall scheme to restrain trade *apart* from the litigation and related conduct. Thus, the case does not present us with the necessity of considering the "overall scheme" exception. *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 994 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 689, 69 L.Ed.2d 659 (1980).

Nor is this a *Walker Process*-type sham case. In *Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Court held that petitioning immunity is lost when a party bringing anticompetitive litigation is involved in unethical conduct such as fraud, bribery, misrepresentation or perjury. Coastal has never urged this theory on appeal or to the district court.

riam). As a result, *Otter Tail* is of limited precedential value.[43]

In *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1981), the Court suggested that a litigant enjoys immunity unless his sole motivation is anticompetitive. Ruling on the validity of a California administrative procedure for the establishment of new automotive dealerships, the Court noted, "Dealers who press sham protests before the New Motor Vehicle Board for *the sole purpose* of delaying the establishment of competing dealerships may be vulnerable to suit under the federal antitrust laws." *Id.* at 110 n. 15, 99 S.Ct. at 412 n. 15, 58 L.Ed.2d at 376 n. 15 (emphasis added) (citing *California Motor Transport*).

Recent lower court decisions also support the conclusion that anticompetitive motives do not taint a suit filed, at least in part, in hope of judicial relief. In *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1200 (8th Cir.1982), for example, the court considered litigation that was filed

for anticompetitive purposes. Among other things, the court found that the plaintiffs hoped the cost of the suit would "break" their competitor's "back." Because there was also a genuine legal dispute, however, the litigation was protected. *Id.*[44]

■ A litigant should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit. This criterion takes account of the mixed motives that usually actuate human conduct, yet requires that good faith in seeking the protection of the courts be a substantial factor.[45]

The stipulations established, at the very least, that one of the Hunts' motives in initiating the publicity and litigation was "to establish ownership of Sarir crude and its products after the expropriation of nationalization." Coastal stipulated that this was the Hunts' purpose and failed to adduce substantial evidence either of a different purpose or of extra-petitioning antitrust conduct.[46] On such a record, we can-

43. At least one commentator has urged a similar "primary purpose" motivation standard. *See* Bien, *Litigation as an Antitrust Violation: Conflict Between the First Amendment and the Sherman Act,* 16 U.S.F.L.Rev. 41, 92 (1981).

44. *See also Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.,* 690 F.2d 1240, 1254 (9th Cir.1982) ("Genuine efforts to induce governmental action are shielded by *Noerr* even if their express and sole purpose is to stifle or eliminate competition."); *Forro Precision, Inc. v. IBM,* 673 F.2d 1045, 1060–61 (9th Cir.1982) (sham exception applies when petition "is undertaken for purely anti-competitive reasons"); *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171, 1175 (10th Cir.1982) (sham exception applicable when suit is "nothing more" than attempt to interfere with business relationships of competitor); *Landmarks Holding Corp. v. Bermant,* 664 F.2d 891, 896-97 (2d Cir.1981) (sham exception applicable if litigation brought "solely to harass and hinder a competitor"). In *Associated Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1358 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740–41, 68 L.Ed.2d 226 (1981), we held a complaint within the sham exception which alleged that the suit was brought "*not for* a proper purpose *but for* the purpose of achieving an unlawful objective." *Id.* at 1358 (emphasis added).

45. The standard we articulate is similar to the initial burden of proof faced by a public employee seeking to show that he was discharged because of constitutionally protected conduct. The employee must show that his conduct was protected and that it played a "substantial" part in the employer's decision to discharge him. *See Givhan v. Western Line Cons. School Dist.,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619, 625 (1979); *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 285, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 482 (1977). The same standard applies in some fourteenth amendment cases. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Of course, a showing that the defendant was "substantially" motivated by impermissible factors is only the beginning of these cases. The burden then shifts to the defendant. In petitioning immunity cases, showing to the satisfaction of the trier of fact that the defendant's conduct was "substantially" motivated by a hope of judicial relief will, absent evidence of sham, end the case. Nothing more is required to bring the case within the immunity.

46. There is one procedural irregularity that complicates our assessment of the insufficiency of Coastal's evidence. In the normal case, the defendant would have the burden of producing evidence demonstrating that its conduct fell

not say that the district court erred in directing the verdict in favor of the Hunts.[47]

### III.

The Hunts concede that their counterclaim was identical in parties and issues to the conversion suit they lost in the Texas state courts.[48] Nevertheless, they appeal the district court's holding that res judicata barred the counterclaim. We affirm.

■ 28 U.S.C. § 1738 (1976)[49] commands that federal courts give the same preclusive effect to the Texas judgment as it would be given under Texas law. *See Kremer v. Chemical Construction Corp.,* — U.S. —, —, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262, 270 (1982); *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308, 313 (1980); *E.D. Systems Corp. v. Southwestern Bell Telephone Co.,* 674 F.2d 453, 457 (5th Cir.1982). Under Texas law, "the doctrine of res judicata precludes subsequent relitigation by the same parties of a question of law or issue of fact which have [sic] been determined by a court of competent jurisdiction." *E.D. Systems,* 674 F.2d at 457 (quoting *Gottschald v. Reaves,* 470 S.W.2d 149, 151 (Tex.Civ.App.1971)). *Accord Puga v. Donna Fruit Co.,* 634 S.W.2d 677, 679 (Tex.1982); *Texas Water Rights Commission v. Crow Iron Works,* 582 S.W.2d 768, 771–72 (Tex.1979).

We do not understand the Hunts to question that under Texas law the counterclaim would be barred by res judicata. Instead they contend that their counterclaim presented important issues of federal law and that the district court should have disregarded the normal operation of section 1738 to ensure a correct determination of those issues. The argument thus amounts to little more than a restatement of the proposition rejected in *Allen v. McCurry:* "every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of the legal posture in which the federal claim arises." 449 U.S. at 103, 101 S.Ct. at 419, 66 L.Ed.2d at 319.

In *Kremer,* the Supreme Court held that federal courts were required to apply section 1738 in Title VII actions. In *Allen,* the court reached a similar conclusion with respect to section 1983 suits. In light of these holdings, it is simply untenable to claim that we can disregard section 1738 in any case presenting important federal questions. We, therefore, reject the Hunts' suggestion that the district court erred in granting summary judgment on the counterclaim.

For these reasons, the judgment is AFFIRMED.

---

within the scope of petitioning immunity. Only after such a showing would the burden shift back to the plaintiff to show sham. Therefore, since the district court directed a verdict in this case before the Hunts' case-in-chief, Coastal's burden to demonstrate sham had not yet technically been activated.

We are convinced, however, that Coastal was not prejudiced by the procedure followed by the district court. There is no question that the issue of sham was joined in the plaintiffs' case-in-chief. Indeed, plaintiffs argue vigorously on appeal that the issue of the Hunts' intent was extensively addressed during their case. Moreover, Coastal has never asserted that there is additional evidence of sham it was unable to introduce.

While we think the better course is to reach the issue of sham only after the defendant has made a prima facie showing that its conduct falls within the protection of petitioning immunity, we are confident that the issue was fully presented in this case.

**47.** Because of the views we take on the issues addressed above, we need not reach the Hunts' additional arguments that Coastal is estopped from claiming sham and that their own conduct, even if unprotected, did not constitute an unreasonable restraint of trade in Sarir crude.

**48.** *See supra* note 7.

**49.** "The ... judicial proceedings of any court of any such state ... shall have the full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such state."