**HUMBOLDT BAY MUNICIPAL WATER DISTRICT, Plaintiff,**

v.

**LOUISIANA–PACIFIC CORP., Simpson Timber Co., Simpson Paper Co., Crown Zellerbach Corp., Humboldt Bay Pulp Co., Defendants.**

No. C–83–5637 SC.

United States District Court, N.D. California.

May 10, 1985.

Khourie & Crew, San Francisco, Cal., for plaintiff.

Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Louisiana Pacific Corp.

Pillsbury, Madison & Sutro, San Francisco, Cal., for Simpson Timber Co., Simpson Paper Co., Crown Zellerbach Corp., & Humboldt Bay Pulp Co.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING PENDENT CLAIMS

CONTI, District Judge.

Plaintiff Humboldt Bay Municipal Water District ("the District") brings this action

against defendant Louisiana-Pacific Corporation ("L–P") and the other defendants, collectively referred to as "Simpson," on two federal and three pendent state claims, alleging, *inter alia*, antitrust violations on the part of L–P and Simpson. The five claims are denominated by plaintiff as follows: 1) "Sherman Act Section 1;" 2) "Sherman Act Section 2;" 3) "Cartwright Act;" 4) "Reformation Due to Economic Impracticability and Frustration of Purpose;" and 5) "Gift of Public Funds." This matter is currently before the court on defendants' motion for summary judgment and plaintiff's motion for partial summary judgment. The court's thorough survey of the voluminous record of evidentiary exhibits reveals the following factual background to this case.

## FACTUAL BACKGROUND

The District was formed in 1956 with the purpose of servicing water to one or more potential pulp mills in Humboldt County. The voters authorized the District to issue $12 million in bonds to be secured by ad valorem property taxes. The District put together a plan to build a dam and diversion project capable of supplying Humboldt County with 75 to 125 million gallons of water a day, the bulk of which would be available for industrial use.

In the spring of 1959, the District began serious negotiations with Georgia-Pacific ("G–P"), the predecessor corporation to L–P, and made a rate proposal for a long-term water supply contract. G–P accepted the rate proposal in writing. Sometime later, Simpson agreed to the same rate proposal that G–P had accepted. Once G–P and Simpson agreed to the rate proposal, the District drafted identical contracts incorporating its proposed rate structure and the 40-year contractual term now complained of by plaintiff, and circulated identical drafts to the negotiators for the mills. G–P and Simpson executed the identical water contracts in September, 1959. Since 1959, the contracts have been identically amended several times.

From the outset, the District insisted that the contracts with each of the mills be identical. It was the District's position that identical contracts and amendments were mandated under California law. The District has continually attempted to have all negotiations concerning the contracts and amendments conducted jointly with all three parties.

As planned, a few months after signing the 1959 contracts, the District issued 40-year municipal bonds secured by its property taxing power. In calculating the rates charged L–P and Simpson, the District hoped to minimize the tax burden on property owners. The identical 1959 contracts, however, imposed no obligation on either side regarding taxes. The District did not impose taxes from 1966, when defendants' pulp mills began operation, until 1976, when the District received an adverse IRS ruling.

The 1959 contracts obligated the District to sell and defendants to purchase a minimum quantity of water, subject to availability, at a price set in the contracts. A sliding scale was set for water sold in excess of the minimum quantities. The prices were subject to adjustment to reflect any differences between estimated and actual costs of construction of the District's facilities and, in fact, the stated prices were increased by 20 percent. In addition, 15 percent of defendants' payments was subject to further annual adjustments based on changes in the index of wholesale prices. By its terms, the 1959 contracts were to expire on December 31, 1999.

On February 23, 1966, defendants and the District entered into amendments to the contracts for supplemental water volumes. The amendments provided for a sale of additional water, reducible at the District's discretion to supply other customers. The 1966 amended contracts contemplated that the District would construct additional facilities and they related payments for the additional water to be provided to the District's actual or estimated costs for the additional facilities. In order to accomplish this, the amendments estab-

lished a "Contract Price," to be calculated each year, which was to be the sum of four "Price Factors."

On January 28, 1975, defendants and the District entered into further amendments to the contracts after it became apparent that existing facilities were incapable of providing the amount of water desired. The 1975 amended contracts provided for modifications in the facilities together with an adjustment of prices for water.

For nearly 18 years all the parties operated under and relied on the contracts and their amendments, and nobody challenged their validity in whole or in part. However, on April 14, 1977, the board of directors of the District passed a resolution directing the general manager to prepare an ordinance embodying a new rate schedule applicable to all the District's customers. The resolution was based on the opinion of the board that existing contract provisions that established the price of water to customers constituted an invalid limitation on the power of the board to set rates. On this basis, the board declared that it did not consider itself bound by the rate provisions of any of its industrial or municipal contracts. Pursuant to this resolution, Ordinance No. 10 was passed by the board on July 14, 1977. Ordinance No. 10 established a new rate structure which purported to supercede only those portions of preexisting contracts with the District's industrial and municipal customers which establish rates and charges for water.

Litigation over the validity of Ordinance No. 10 ensued, and on November 2, 1982, the California Court of Appeal rendered a decision which invalidated Ordinance No. 10 and upheld the validity of Simpson's and L–P's contracts with the District. *See Louisiana-Pacific Corp. v. Humboldt Bay Mun. Water Dist.*, 137 Cal.App.3d 152, 162, 186 Cal.Rptr. 833 (1982) (The District entered into the contracts "in order to bind [defendants] to a firm obligation to purchase a specified amount of water and thereby obtained for itself the benefit of a long-term guarantee of patronage. [The] District is bound to the obligation to which it agreed in order to obtain that guarantee.").

In April 1983, on remand to the Superior Court, the District moved to amend its answer and file a cross-complaint to assert for the first time that defendants' conduct regarding the 1959 contracts and the following amendments resulted from a conspiracy to fix prices and restrain trade in violation of California's Cartwright Act. The Superior Court granted the motion but the California Court of Appeal issued a writ of mandate and supporting opinion directing that the amended answer and cross-complaint be stricken.

The District now raises similar antitrust allegations in this federal action under the Sherman Act, 15 U.S.C. § 1 & 2, and the Cartwright Act as raised in the state action solely under the Cartwright Act, along with its pendent state claims.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' move for summary judgment on various grounds as to the District's federal antitrust claims and pendent state claims. Because defendants' motion for summary judgment is meritorious on the District's federal antitrust claims, as will be discussed immediately below, and because the court will not retain jurisdiction of this case solely on the District's pendent state claims, as will be discussed shortly, the court will only address defendants' motion for summary judgment as to the federal antitrust claims. Defendants first argue that they are entitled to summary judgment because the District cannot establish any of the factual elements necessary to maintain claims for violations of Sections 1 and 2 of the Sherman Act. Defendants next raise the following four legal defenses which purportedly bar the District's antitrust claims: (a) the District's complete involvement in the activities complained of; (b) the relevant statute of limitations; (c) the *Noerr-Pennington* doctrine; and (d) *res judicata* and collateral estoppel. Because defendants' first argument is accurate that the District cannot

establish the factual elements necessary to maintain claims under Sections 1 and 2 of the Sherman Act, as set out immediately below, the court will not address the four defenses raised by defendants.

Generally, summary judgment is appropriate only when the moving party meets its burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see, Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Bank of California, N.A. v. Opie*, 663 F.2d 977, 979 (9th Cir. 1981); *State ex rel. Edwards v. Heimann*, 633 F.2d 886, 888 (9th Cir.1980). Summary judgment is equally available in antitrust cases. *Ralph C. Wilson Indus. v. American Broadcasting*, 598 F.Supp. 694, 699 & n. 5 (N.D.Cal.1984) and cases and authorities cited therein. In fact, "summary judgment is often particularly appropriate in antitrust cases because of the 'fearful dimensions' of such cases, and the fact that many suits are motivated by 'commercial disappointment' rather than genuine antitrust problems." *Id.* at 699. (String citations omitted). Furthermore, "[g]iven the enormous expenditure of time and other resources commonly necessary in antitrust cases, the complexity of the issues and the general inexperience of jurors in this area, as well as the need for uniformity and foreseeability in interpretations of the antitrust law, the court should, rather, be particularly alert to granting summary judgment in appropriate cases." *Id.* (String citations omitted).

The posture of this case is appropriate for consideration of summary judgment. The parties have conducted extensive discovery and trial is scheduled a mere few weeks from now. In the context of the fully developed record, "if the court finds that a directed verdict for defendants would be required even if all plaintiff's proffered evidence were admitted at trial, then the court should not be hesitant to grant summary judgment at this stage of the proceeding." *Id.* at 700; *see also First National Bank v. Cities Service Co.*, 391 U.S. 253, 274–90, 88 S.Ct. 1575, 1585–93, 20 L.Ed.2d 569 (1968) (Held: even though plaintiff's evidence showing conspiracy might present jury question, defendants' evidence to the contrary was so overwhelming that summary judgment was appropriate). Applying the above legal standards to the facts surrounding the District's federal antitrust claims, the court will grant defendants' motion for summary judgment.

*First Claim: Sherman Act Section 1*

The thrust of the District's first claim, under Section 1 of the Sherman Act, is summarized by the following allegations in the first amended complaint:

> Commencing in approximately 1957 and continuing to the present, defendants have combined and conspired with each other to restrain trade and commerce in the purchase of water in violation of § 1 of the Sherman Act. Pursuant thereto, defendants in September 1959 jointly exacted from the Water District virtually identical exclusive requirements contracts obligating the Water District to supply defendants with the bulk of the Water District's reserves for defendants' use in their pulp mill operations. Both contracts provided for identical prices and both contracts were of identical duration, with an expiration date of December 31, 1999. Said requirements contracts were and are unreasonable restraints upon trade....

The District further alleges that, "[a]s a direct result of defendants' violations, the Water District and all taxpayers within its jurisdiction have suffered and will continue to suffer damages in excess of $10 million unless this court intervenes."

In *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1295–96 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 279, 78 L.Ed.2d 259 (1983), the Ninth Circuit articulated the following standards to be applied when determining alleged violations of Section 1 of the Sherman Act:

> Certain joint conduct by business entities constitutes a *per se* violation of § 1 of the Sherman Act. This category of con-

duct includes price-fixing and horizontal territorial division. When this type of behavior is proved, a court is blocked from inquiring into the "reasonableness" of the defendants' actions.

Absent a showing of a *per se* violation, a court must apply a rule of reason analysis. Under this test, the elements of a cause of action for an unreasonable restraint of trade in violation of § 1 of the Sherman Act are:

(1) An agreement among two or more persons or distinct business entities;

(2) which is intended to harm or unreasonably restrain competition; and

(3) which actually causes injury to competition.

(Citations omitted).

Upon a review of the record, as discussed below, the court finds that the District has not established any genuine issues of material fact suggesting that defendants have committed either a *per se* violation of Section 1 of the Sherman Act or rule of reason unreasonable restraint of trade in violation of Section 1.

### Alleged Per Se Violation

■■■ The first claim of the first amended complaint indirectly alleges that defendants have fixed the price at which they purchase the water from the District by way of their identical long-term contracts, and subsequent contractual amendments, with the District. This allegation fails in light of the earlier summarized evidence which demonstrates that the contractual rate of the water was proposed by the District, and was later accepted by L–P and Simpson separately and independently for inclusion in their separate contracts with the District. Even if defendants negotiated with the District concerning the rates set for the water in the contracts, the law provides that a buyer is not involved in illegal price fixing when it negotiates with a seller to include a price in a commercial contract. *See Sausalito Pharmacy v. Blue Shield of California*, 544 F.Supp. 230, 237 (N.D.Cal.1981), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982).

### Rule of Reason Analysis

■■■ The District also alleges in the first claim that defendants unreasonably restrained trade in the relevant market for water in Humboldt County. The District alleges that defendants so unreasonably restrained trade by executing identical water contracts at identical rates, taking joint action with respect to proposed terms in later renegotiations of the contracts, initiating litigation in state court over Ordinance No. 10, and by jointly refusing to renegotiate the water contracts subsequent to the litigation over Ordinance No. 10. As set out below, no evidence in the record supports any of the above allegations to the extent that the District can establish a genuine issue of material fact suggesting that L–P and Simpson had an agreement which was intended to harm or unreasonably restrain competition and which actually caused injury to competition.

The evidence instead reveals the following: (1) the District, not defendants, insisted that the water contracts be identical at rates set by the District; (2) the District arranged numerous joint meetings with and sent countless joint letters to defendants, often with instructions to respond to the District with a mutually acceptable proposal, and it was thus the District's activity which precipitated joint action on the part of defendants and not an intent on the part of defendants to harm or unreasonably restrain competition (*cf. Treasure Val. Potato Bar Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 209 (9th Cir.1974), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974); (3) the District abrogated the rates set in the water contracts by enacting Ordinance No. 10 and instructed its attorney to file suit in Superior Court to have the ordinance declared valid; consequently, defendants' initiation of litigation was legitimate business behavior to protect the rates under the contracts and was not an unreasonable restraint of trade in light of the fact that the District was proceeding to Superior Court anyway and that defendants ultimately prevailed on the point that Ordi-

nance No. 10 was invalid; and (4) even if defendants had refused to renegotiate the water contracts subsequent to the litigation which resulted in Ordinance No. 10 being held invalid, such refusal would merely obligate the District to abide by the rates set by the contracts; nevertheless, ample evidence demonstrates that Simpson, separately and independently from L–P, initiated renegotiation discussions with the District in 1983 which eventually broke off.

Based on the foregoing, the District fails under both *per se* violation standards and rule of reason analysis to provide any factual support for its Sherman Act Section 1 claim, and consequently, defendants' motion for summary judgment must be granted on this claim.

### Second Claim: Sherman Act Section 2

The District alleges in its second claim that, "defendants have monopolized and conspired and attempted to monopolize the purchase of water in Humboldt County in violation of § 2 of the Sherman Act (15 U.S.C. § 2)."

### Monopolization Cause of Action

■■■ To prove monopolization under Section 2 of the Sherman Act, the District must show: (1) the possession of monopoly power in the relevant market; (2) the unlawful acquisition or maintenance of that power; and (3) causal antitrust injury. *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 279, 78 L.Ed.2d 259 (1983). Upon a review of the record, there are no genuine issues of material fact to support the District's Section 2 monopolization cause of action. The District fails to establish the first of the above three prongs needed to make out a Section 2 monopolization claim. Monopoly power is the power to control prices or exclude competition, *id.,* and defendants simply have not and do not possess monopoly power over the relevant market of water in Humboldt County. California law grants the District the right to set water rates and to enter into long-term water contracts. Cal.Water Code §§ 71592 and 71616. The totality of the evidence re-

ferred to at the outset of this order reveals that it was the District, and not defendants, that calculated and proposed the prices and duration of the 1959 contracts. Furthermore, it was the District that determined those industrial and municipal users to whom it would sell its water and what quantities of water it would sell. Defendants merely have held and currently hold the contractual rights to water granted to them in 1959 and in subsequent amendments to the contracts, and certainly have not and do not possess monopoly power to control water prices and exclude competition from the water market in Humboldt County.

### Attempt to Monopolize Cause of Action

■■■ The District's second claim also asserts an attempt to monopolize cause of action. In order to establish a cause of action for attempted monopolization under Section 2, the District must show: (1) a specific intent to control prices or destroy competition in the relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose; and (3) a dangerous probability of success. *Cascade Cabinet Co. v. Western Cabinet & Millwork,* 710 F.2d 1366, 1373 (9th Cir. 1983). The District puts forth no genuine issues of material fact suggesting that defendants had the specific intent to control prices or competition for the water in Humboldt County, or that defendants engaged in predatory or anticompetitive conduct directed to accomplishing such an unlawful purpose. The District merely asserts that defendants receive 80% of the District's supply of water. However, it was the District, exercising its statutory power to contractually grant that supply of water to defendants, rather than defendants, with alleged intent or conduct to attempt to monopolize the water market, that resulted in defendants' acquisition of their supply of water. Thus, the District's attempt to monopolize cause of action fails.

### Conspiracy to Monopolize Cause of Action

■■■ The District's second claim also raises a conspiracy to monopolize cause of

569

action. This cause of action, "is similar in its essence to an attempt to monopolize action," as, "[b]oth focus on specific intent to monopolize and anticompetitive acts designed to effect that intent, although in the conspiracy claim the act may be no more than the agreement itself." *Hunt-Wesson Foods, Inc., v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). This cause of action fails for the reasons stated above in regard to the District's attempt to monopolize cause of action, and because no evidence has been presented which even circumstantially indicates an agreement existed between defendants to monopolize the relevant water market.

Therefore, based on all of the above, the District has not supported with evidence any of its causes of action under its Sherman Act Section 2 claim, and therefore, defendants' motion for summary judgment must be granted in full on the Section 2 claim.

### THE DISTRICT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The District moves for partial summary judgment on its antitrust claims and its pendent reformation claim. Regarding its antitrust claims, the District merely argues that defendant has committed, "a *per se* violation of the antitrust laws." The court has already granted summary judgment in defendants' favor on the District's claims under Sections 1 and 2 of the Sherman Act, and has specifically held that defendants have not committed a *per se* violation under Section 1. Furthermore, as discussed immediately below, the court will not retain jurisdiction of this case based solely on the District's pendent claims, and thus will not consider the District's motion for partial summary judgment on its reformation claim. Therefore, the District's motion for partial summary judgment is denied in full.

### THE DISTRICT'S PENDENT CLAIMS

▉ The court concludes that the pendent claims must be dismissed for lack of federal subject matter jurisdiction. Ninth Circuit caselaw provides that, "[t]he doctrine of pendent jurisdiction is one of discretion, not of power, as long as the federal claims are substantial enough to confer subject-matter jurisdiction on the federal court," and the issue of whether pendent jurisdiction is properly assumed is one which remains open throughout the litigation. *Wren v. Sletten Const. Co.*, 654 F.2d 529, 536 (9th Cir.1981) (per curiam). Furthermore and most importantly, "[w]hen the state issues apparently predominate and all federal claims are dismissed before trial, the proper exercise of discretion requires dismissal of the state claim[s]." *Id.* Having granted summary judgment for defendants on the District's federal antitrust claims, all that remains before the court are the District's pendent claims which involve state issues. Moreover, the court previously held in its order dated September 21, 1984 that diversity jurisdiction does not lie in this case. Accordingly, the court must properly exercise its discretion by dismissing the District's pendent claims, although at first blush the court finds the District's reformation claim of some merit. The District should bring the pendent claims which are not precluded by previous litigation in state court, if any of these remain viable.

### ORDER

In accordance with the foregoing, it is hereby ordered that:

(1) defendants' motion for summary judgment is granted in full on the District's first and second claims under Section 1 and 2 of the Sherman Act;

(2) the District's motion for partial summary judgment is denied in full; and

(3) the District's pendent claims are dismissed for lack of federal subject matter jurisdiction.