Margaret F. SAVAGE and Independent Haulers, Inc., Plaintiffs,

v.

WASTE MANAGEMENT, INC.; Waste Management of South Carolina, Inc., Defendants.

Civ. A. No. 2:82–3263–1.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 19, 1985.

James H. Moss, Beaufort, S.C., and Harry A. Swagart, III, Columbia, S.C., for plaintiffs.

Edward L. Michael, Joseph V. Giffin, and John E. Noel, Chicago, Ill., and Joab M. Dowling, Jr., Beaufort, S.C., for defendants.

## ORDER AND JUDGMENT

HAWKINS, District Judge.

This action is before the court on motion of defendants Waste Management, Inc. (hereinafter WMI) and Waste Management of South Carolina, Inc. (hereinafter WMSC) for summary judgment as to plaintiffs' second amended complaint, on defendant WMSC's motion for summary judgment on its counterclaim and on the plaintiffs' motion for summary judgment as to Count VII of their second amended complaint and motion for partial summary judgment, including a cross-motion for summary judgment as to WMSC's counterclaim. The is-

sue presented in the motions, except those regarding the counterclaim, is whether the allegedly anticompetitive acts attributed to the defendants are shielded from federal antitrust liability by the "state action" doctrine first enunciated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

The plaintiffs allege that Beaufort County, Beaufort County Council, Waste Management of South Carolina, Inc. and Waste Management, Inc. violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, by entering into and performing under contracts for the exclusive collection and disposal of garbage in certain areas of the county.[1] Second Amended Complaint (filed June 29, 1985). In addition, the plaintiffs allege that these actions violated a Beaufort County ordinance and South Carolina antitrust laws.

Oral arguments on these motions were heard on October 3, 1985, at which time the motions were taken under advisement. The court has now reviewed those arguments, the motions and briefs of counsel, and makes the following rulings.

## I. THE SUMMARY JUDGMENT STANDARD

In order to obtain summary judgment, a party must demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. In *First National Bank v. Cities Services Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court made it clear that summary judgment is an important tool in antitrust litigation. The Court stated that "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him" (391 U.S. at 289, 88 S.Ct. at 1592) and that:

---

1. Beaufort County and Beaufort County Council were dismissed from the suit after reaching a settlement with plaintiffs. WMSC is a competi-

tor of the plaintiff and a wholly-owned subsidiary of WMI.

While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. at 290, 88 S.Ct. at 1593. *See also, Ottensmeyer v. Chesapeake & Potomac Telephone Company of Maryland,* 756 F.2d 986 (4th Cir.1985) (summary judgment against plaintiff affirmed in Sherman § 1 case); *Stearns v. Genrad, Inc.,* 752 F.2d 942 (4th Cir.1985) (summary judgment against plaintiff affirmed on claim of attempted monopolization); *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.,* 602 F.2d 1173 (4th Cir.1979) (summary judgment against plaintiff affirmed on Sherman § 1 claim); *Kendall Elevator Co., Inc. v. LBC & W Associates of South Carolina, Inc.,* 350 F.Supp. 75 (D.S.C.1972) (summary judgment granted in favor of defendant on Sherman § 1 claim).

This court is aware that *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), decided before the Supreme Court's decision in *Cities Service, supra,* is frequently cited for the proposition that summary judgment is to be granted sparingly in antitrust cases. E.g., see this court's opinion in *Trident Neuro-Imaging Laboratory v. Blue Cross,* 568 F.Supp. 1474, 1478–79 (D.S.C.1983). However, *Poller* is plainly not a bar to granting summary judgment in antitrust cases as is made clear by the Fourth Circuit cases cited in the above text and by numerous decisions from other circuits. *See also, Trident Neuro-Imaging Laboratory v. Blue Cross,* 1983–2 Trade Cases (CCH) ¶ 65,674 (D.S.C.1982), where this court granted summary judgment in an antitrust case. Moreover, the statements in the *Poller* case are of questionable validity in light of the Supreme Court's

subsequent decision in the *Cities Service* case, *see Legal Times,* Vol. V, No. 36 (Feb. 14, 1983). Indeed, some courts have held that "the very nature of antitrust litigation would *encourage* summary disposition of such cases where permissible ... antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work ... [and] the statutory private antitrust remedy affords a special temptation for institution of vexatious litigation...." *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1167 (7th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979) (emphasis added).

Summary judgment is particularly appropriate when, as here, all discovery on the key issues has been completed. In this posture, a motion for summary judgment is more like a motion for directed verdict since all of the evidence of the parties on the key issues is before the court. In *Sun Valley Disposal Co., Inc. v. Silver State Disposal Co.,* 1970 Trade Cases (CCH), ¶ 73,028 (D.Nev.1968), *aff'd,* 420 F.2d 341 (9th Cir.1969), for example, the court noted that, as in this case, discovery had been completed and all of the plaintiff's "cards were on the table." In granting summary judgment for defendants on plaintiff's complaint (including claims of antitrust conspiracy in the granting of an exclusive refuse collection franchise), the court explained that

> [t]he "Golden Fleece" of treble damages plus attorneys' fees and costs has led the diligent, aggressive lawyer to adopt the language of monopoly and restraint of trade to all varieties of normal, standard and customary business transactions. While such expertise in legal composition may withstand a motion to dismiss, it does not require or justify judicial submission to the descriptive language of the pleadings when the facts are laid bare.

1970 Trade Cases (CCH) at ¶ 88,030. *See also, Universal Lite Distributors, Inc. v.*

*Northwest Industries, Inc.,* 452 F.Supp. 1206, 1210 (D.Md.1978), *aff'd in part,* 602 F.2d 1173 (4th Cir.1979) (granting summary judgment on plaintiff's complaint, including antitrust conspiracy claim, after three years of extensive discovery had been completed); *Ralph C. Wilson Industries v. American Broadcasting Companies,* 598 F.Supp. 694, 700 (N.D.Cal.1984) (given extensive discovery and fully developed record, the court treated motion for summary judgment as motion for directed verdict with assumption that all evidence available to plaintiff would be admitted at trial, and granted summary judgment in defendants' favor); *Humboldt Bay Municipal Water v. Louisiana—Pacific Corp.,* 608 F.Supp. 562 (N.D.Cal.1985) (granting summary judgment in defendants' favor on basis of fully developed record after extensive discovery).

When tested by these principles, the undisputed facts clearly show that WMSC and WMI are entitled, as a matter of law, to judgment in their favor on plaintiffs' complaint.

## II. COUNTY IMMUNITY [2]

■ The Supreme Court has recently reiterated that a municipality is immune from antitrust liability when "engaging in the challenged activity pursuant to a clearly expressed state policy." *Town of Hallie v. City of Eau Claire,* — U.S. —, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985). This requirement is satisfied when the conduct at issue is a "foreseeable result" of regulatory activity authorized by the state. *Id.* 105 S.Ct. at 1718.

The Court noted that "[i]t is not necessary ... for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects." *Id.* at 1718. It is only necessary that "the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure." *Southern Motor Carriers Rate Conference v. U.S.,* — U.S. —, 105 S.Ct. 1721, 1731, 85 L.Ed.2d 36 (1985). Furthermore, the Court held that a city need not demonstrate that the state compelled or actively supervised its allegedly anticompetitive conduct. *Town of Hallie v. City of Eau Claire,* 105 S.Ct. at 1715, 1720.

In this case, Beaufort County claims to have acted pursuant to South Carolina Code Ann. § 44–55–1010 (1976) *et seq. See* Memorandum in Support of Defendants' Motion for Summary Judgment at 49–52 (filed June 27, 1985). These statutes provide that a county "may regulate the collection and disposal of garbage in accordance with the provisions of this article." S.C. CODE ANN. § 44–55–1010. "Collection or disposal of garbage without a license [from the county] is unlawful." S.C.CODE ANN. § 44–55–1030. Most importantly, the county "may call for bids for the right to collect and dispose of garbage *or may issue to one or more persons on such terms as it shall fix the right or franchise to collect and dispose of garbage not inconsistent with the provisions of this article.*" S.C. CODE ANN. § 44–55–1040 (emphasis added). Finally, the County Health Department is to exercise supervision over the manner of collection and disposal of garbage. S.C.CODE ANN. § 44–55–1050.

It is clear that the policy underlying these statutes is to give counties the choice of whether or not to regulate the collection and disposal of garbage under the provisions of this article. S.C.CODE ANN. § 44–55–1010 *et seq.* The legislature surely contemplated that one means of implementing this policy, consistent with S.C. CODE ANN. § 44–55–1040, might be to award exclusive contracts for the collection and disposal of garbage in certain areas of Beaufort County. In *Town of Hallie,* the Supreme Court made it clear that it is "not necessary ... for the state legislature to

2. Although the County is no longer a party to this suit, this discussion is helpful in understanding this court's decision.

have stated explicitly that it *expected* the City to engage in conduct that would have anticompetitive effects...." Rather, it is sufficient that the statutes *authorize* the City to provide the services in question and "clearly contemplate that a city may engage in anticompetitive conduct." 105 S.Ct. at 1718 (emphasis added). *See also, Gold Cross Ambulance & Tran. v. City of Kansas City,* 705 F.2d 1005, 1013 (8th Cir. 1983) ("one or more" term in statute held to authorize award of exclusive contracts for purposes of State Action immunity); *Tom Hudson & Associates, v. City of Chula Vista,* 746 F.2d 1370 (9th Cir.1984) (statute authorizing cities to determine "whether or not" refuse services would be provided by means of exclusive franchise held to be "clear articulation" of state policy even though not mandatory by its terms). Finally, authorization by the State of South Carolina is consistent with the "traditional" view that refuse collection and disposal is a local governmental function, and it is consistent with a long line of cases which have upheld the authority of local governments to grant to private parties the exclusive right to collect and dispose of refuse. *See* 56 Am.Jur.2d *Municipal Corporations* §§ 457, 462, 513; *Cen. Iowa Ref. Sys. v. Des Moines Metro. Sol. Waste,* 715 F.2d 419 (8th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *Hybud Equipment Corp. v. City of Akron,* 742 F.2d 949 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985).

The plaintiffs contend that "the statutory language is neutral as to the displacement of competition." *See* Primary Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment at pp. 4, 10 (filed Aug. 20, 1985). They also contend "there is no indication that the legislature contemplated awarding exclusive rights and franchises." *Id.* The Supreme Court rejected these same arguments in *Town of Hallie,* stating:

It is not necessary, as the Towns contend, for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects. Applying the analysis of *City of Lafayette,* 435 U.S. 389 [98 S.Ct. 1123, 55 L.Ed.2d 364] (1978), *it is sufficient that the statutes authorized the City to provide sewage* services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.

. . . .

... [T]he State has specifically authorized Wisconsin cities to provide sewage services and has delegated to the cities the express authority to take action that foreseeably will result in anticompetitive effects. No reasonable argument can be made that these statutes are neutral in the same way that Colorado's Home Rule Amendment was.

105 S.Ct. at 1718–19 (emphasis added). Finally, the Court rejected the Town's argument that the state action exemption should not be applicable unless the State "compelled" the City to engage in the alleged anticompetitive activity and "actively supervised" the City:

None of our cases involving the application of the state action exemption to a municipality has required that compulsion be shown.... In short, although compulsion affirmatively expressed may be the best evidence of state policy, it is by no means a prerequisite to a finding that a municipality acted pursuant to clearly articulated state policy.

. . . .

Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

105 S.Ct. at 1720–1.

This court finds that S.C.CODE ANN. § 44–55–1010 (1976) *et seq.* sufficiently

demonstrate a clear state policy authorizing counties to regulate the collection and disposal of garbage within their borders. In addition, since counties are expressly authorized to grant franchises to "*one or more persons*" (emphasis added), the State obviously "contemplated" that counties could grant exclusive contracts or franchises for garbage collection and disposal.

In sum, this court finds that Beaufort County and Beaufort County Council acted pursuant to a clearly articulated state policy in granting to the defendants an exclusive franchise for the collection and disposal of garbage in specified areas of Beaufort County. Accordingly, Beaufort County is immune from federal antitrust liability under the "state action" doctrine. As noted earlier, Beaufort County need not demonstrate that the state actively supervised the negotiation or implementation of the contracts at issue in this case. *See Town of Hallie*, 105 S.Ct. at 1720.

### III. PRIVATE PARTIES

■ The Supreme Court has held that the actions of private parties are exempt from federal antitrust liability if they are undertaken pursuant to a clearly articulated state policy and are supervised actively by the state. *See Southern Motor Carriers Rate Conference v. U.S.*, 105 S.Ct. at 1729; *Cal. Retail Liquor Dealers Ass'n v. Midcal Alum.*, 445 U.S. 97, 105–06, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

The court has already found that the first prong of this test is satisfied in the circumstances of this case because S.C. CODE ANN. § 44–55–1010 *et seq.* clearly authorize the challenged activities.

The plaintiffs contend that the second prong of this test can only be satisfied by the state actively supervising the actions of private parties (the defendants in this case). Plaintiffs have quoted from three cases in support of their position, but these cases are factually distinguishable. The quotes

appear on page 5 of the Primary Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment and read as follows:

> In *Town of Hallie* the Supreme Court stated that
>
>> Where state or municipal regulation of a private party is involved ..., active *state* supervision must be shown, even where a clearly articulated state policy exists.

105 S.Ct. at 1720 n. 10 (emphasis added). The purpose of requiring active state supervision of the regulation of private parties is to prevent

> (s)tates from "casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal*, 445 U.S. at 106 [100 S.Ct. at 943.] This active supervision requirement ensures that a state's actions will immunize the anticompetitive conduct of private parties only when the "state has demonstrated its commitment to a program through its exercise of regulatory oversight." See 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 213a, p. 73 (1978).

*Southern Motor Carriers*, 105 S.Ct. 1729 n. 23.

The quote in *Town of Hallie* is taken from *Southern Motor Carriers*, 105 S.Ct. at 1727. In *Southern Motor Carriers* active state supervision was required, but only because the legislatures of the four states involved had decided that the private parties in that particular case (rate bureaus composed of motor common carriers) would be supervised by state agencies, namely their public service commissions. Therefore, *Southern Motor Carriers* was not a case in which a municipality was supposed to supervise the actions of a private party.

The second quote also appears in *Town of Hallie*, but is taken from *Midcal* 445 U.S. at 106, 100 S.Ct. at 943. Once again, in *Midcal* a state agency was supposed to be supervising private parties engaged in

wine sales. However, the issue there was not *who* was supposed to supervise the private parties (the state was, according to the statute), but *how much* supervision was required for the private parties to be immune from federal antitrust laws under the "state action" doctrine. This case involves only the *level* of supervision that is required for a private party to be immune from federal antitrust laws. The court held that the state's supervision was passive only and, therefore, inadequate for "state action" immunity. It does not mandate that the state must always supervise private parties. The statute there made it plain that the state is to supervise private parties, while in our case S.C.CODE ANN. §§ 44–55–1040, 1050, make it clear that the county and the respective county health departments are to supervise those involved in the garbage collection and disposal business.

The final quote is also taken from *Southern Motor Carriers*, and it supports the reasoning heretofore given: once a state decides to supervise certain private parties, *active* supervision is required to "immunize the anticompetitive conduct of private parties" (emphasis added). This quote does not say that it must always be the state supervising private parties. What it says is that when a state chooses to supervise certain private parties, it must be *active* supervision for the private parties to enjoy immunity from federal antitrust laws under the "state action" doctrine.

The plaintiffs also contend that

[s]econd, there are no state statutes and/or agencies which provide guidance to counties with respect to such matters as determining (1) how many refuse collectors or landfill operators there may be, (2) how those collectors and operators will be selected, (3) what rates the collectors and operators may charge and (4) how those rates are to be determined.

Third, § 44–55–1050 provides that the *county* health department shall enforce the article on garbage collection and re-

moval. This provision clearly demonstrates that the State not only does *not* supervise the actions of the counties taken pursuant to the article, but has expressly abdicated all responsibility for supervision.

The plaintiffs conclude this argument by claiming that even if state supervision could somehow be supplied by county governments, there is no evidence of county supervision in this case. *See* Primary Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment at pp. 6–9. These allegations are simply not true. Section 44–55–1040 of the South Carolina Code, annotated, says "one or more persons" may "collect and dispose of garbage." The person or persons are to be selected by "the governing body" of the county, i.e. county council. The franchise shall be "on such terms as it [county council] shall fix." In fact, the rate charged by the defendants for each ton of refuse dumped at the landfill is significantly less than what the county charged when it operated the landfill just prior to the defendants taking over. *See* Memorandum in Support of Defendants' Motion for Summary Judgment at pp. 14–15.

As to the actual collection and disposal of garbage, it is true that South Carolina has seen fit to delegate supervision to the respective county health departments. Garbage collection and disposal is traditionally a local function of government and "requiring state supervision could force the state and its municipalities to engage in duplicative, wasteful regulation and could erode the local autonomy that the state has sought to encourage." *Town of Hallie*, 700 F.2d at 384.

Furthermore, "[o]nce it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function." *Town of Hallie*, 105 S.Ct. at 1721. Section 44–55–1210 of the South Carolina Code, annotated, allows each county to collect and dispose of gar-

bage itself or "contract with private agencies" to accomplish the job as their employees. It makes little sense to require *state* supervision of a contract between the county and a private party when no such supervision is required if the county does the work itself or hires private employees to do the work. This is a properly delegated local function of government which the county actively supervises.

Defendants point out that the Supreme Court's decision in *Town of Hallie* "is thus consistent with many decisions by Courts of Appeals which have held that State supervision is not required if a local government is authorized to take anticompetitive actions." *See Town of Hallie v. City of Eau Claire,* 700 F.2d 376 (7th Cir.1983), *aff'd,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Gold Cross Ambulance & Tran. v. City of Kansas City,* 705 F.2d 1005 (8th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985) ("regulation by the *City itself* satisfies the active supervision requirement . . . since its regulation of ambulance service is exercised under the authorization and direction of state policy.") (emphasis added); *Cen. Iowa Ref. Sys. v. Des Moines Metro. Sol. Waste,* 715 F.2d 419 (8th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *Pueblo Aircraft Service, Inc. v. City of Pueblo,* 679 F.2d 805 (10th Cir.1982), *cert. denied,* 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983); *Tom Hudson & Associates v. City of Chula*

*Vista,* 746 F.2d 1370 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985). "And, when the local governmental unit contracts with a private party, the supervision of the private party is supplied by the local governmental unit itself." *E.g., Tom Hudson & Associates,* 746 F.2d at 1373–4; *Gold Cross Ambulance,* 705 F.2d at 1014. *See* Memorandum in Support of Defendants' Motion for Summary Judgment at pp. 52–3.

Defendants point out that in the present case it is undisputed that the County actively supervised WMSC's performance under the franchise, the green box contract and the landfill contract. The franchise gives defendants the exclusive right to collect garbage in certain areas of Beaufort County. The green box contract specifies the terms of the garbage collection arrangement between the defendants and the County. The landfill contract governs the disposal of the garbage. The provisions of these contracts establish the County's right to actively supervise WMSC.[3] In addition, the persons involved on behalf of the County and of WMSC testified to active supervision by the County (Haigh deposition, pp. 168–70, A–1; West deposition, pp. 26–27, A–5).[4] There is *no* evidence to the contrary.

This court finds that "[t]he official supervision of the [defendants] in this case is at least equivalent in degree to the official supervision of private defendants that was deemed sufficient in *Southern Motor*

---

**3.** For example, the green box contract (B–13) provides specifications for equipment used by WMSC (¶¶ 2, 3); provides that the County Supervisor of Public Works is to specify container locations to WMSC and review and approve collection schedules (¶¶ 4, 6, 7);. requires WMSC to comply with State and local sanitation laws (¶¶ 2, 9); and limits any increase in fees charged by WMSC to adjustments consistent with certain Price Indexes (¶ 20). Similarly, the franchise agreement (B–12) contains provisions relating to equipment specifications (¶ 2(d)); compliance with State and local sanitation laws (¶ 3); and limitations on pricing increases (¶ 9). The landfill contract (B–10) requires WMSC to comply with all applicable State, local and federal regulations on landfills (¶ 2(d)); allows the

County to inspect the site and place monitoring personnel at the site (¶¶ 2(e), 13, 15); and allows the County to inspect daily records of volume received and fees collected (¶ 18).

**4.** Indeed, WMSC's manager of Edisto Services in 1981 testified that he met almost weekly with the County Supervisor of Public Works concerning the refuse collection contracts. In fact, he always checked with the County Supervisor before increasing prices to Edisto's customers within the areas covered by the contract (West deposition, pp. 26–29, A–5). Memorandum in Support of. Defendants' Motion for Summary Judgment at p. 53.

*Carriers Rate Conference, Inc. v. United States, supra,* and *Gold Cross Ambulance & Transfer v. City of Kansas City, supra.*" *See Trinity Ambulance Service v. G & L Ambulance Service,* 625 F.Supp. 142 1985–2 Trade Cases (CCH) ¶ 66,844 (D.Conn.1985).

■ Finally, the plaintiffs also allege that the defendants conspired with Beaufort County officials to restrain trade, fix prices and monopolize the garbage collection and disposal business in certain areas of Beaufort County. The discussion at 612–13 in the case of *Independent Taxi, Etc. v. Greater Houston, Etc.,* 760 F.2d 607, 613 (5th Cir.1985), addresses the plaintiffs' conspiracy allegations appropriately:

> We need not pause long over appellants' contention that, even if the City is immune from federal antitrust scrutiny under *Parker,* Yellow can be held liable under the Sherman and Clayton Acts for its efforts in securing the exclusive airport taxicab concession from Houston. On appellants' view, the *Noerr-Pennington* doctrine[5] cannot shield Yellow because (1) the doctrine applies only to "specific attempts to influence public officials, legislation or executive action" rather than to "arm's length contractual negotiations," and (2) even if a private party's arms's length contractual activity does implicate the doctrine, Yellow's relationship with the City falls within a "commercial exception" to *Noerr-Pennington* immunity.
>
> "The *Noerr-Pennington* doctrine provides an exception to antitrust liability enabling citizens or business entities to influence or to petition public officials to take official action that will harm or eliminate competition." *Affiliated Capital Corp. v. City of Houston,* 735 F.2d

1555, 1566 (5th Cir.1984) (en banc), *petition for cert. filed sub nom. Gulf Coast Cable Television Co. v. Affiliated Capital Corp.,* —— U.S. ——, 105 S.Ct. 1164, 84 L.Ed.2d 316 (1984). In *Greenwood Utilities Commission v. Mississippi Power Co.,* 751 F.2d 1484 (5th Cir.1985), we recently held that *Noerr-Pennington* extends to situations where the government enters into a contractual relationship with a private entity, at least in situations "where the government engages in a policy decision and at the same time acts as a participant in the marketplace." *Id.* at 1505 (footnote omitted). "We expressly rejected the notion that *Noerr-Pennington's* first amendment and statutory roots are not sympathetic to such agreements, even if they can be properly characterized as essentially commercial." *Id.* at 1504–06; *cf. Mid-Texas Communications Systems, Inc. v. AT & T,* 615 F.2d 1372, 1382–84 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). Viewing the record in the light most favorable to appellants, the most that can be said is that Yellow secured from the City an exclusive concession whose anticompetitive effects stem primarily from a valid municipal, and vicariously state, policy.

The Fifth Circuit court dismissed another allegation of the plaintiffs in a footnote, as follows:

> Appellants also argue that Yellow's conduct falls within either the sham or co-conspirator exception to *Noerr-Pennington. See, e.g., California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511–15, 92 S.Ct. 609, 612–14, 30 L.Ed.2d 642 (1972); *Affiliated Capital Corp. v. City of Houston,* 735

**5.** Based upon *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mineworkers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). "Joint efforts to influence public officials do not violate the antitrust laws even

though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." See Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiffs' First Amended Complaint, at pp. 19–20 (Mar. 1983).

F.2d 1555, 1567 (5th Cir.1984) (en banc), *petition for cert. filed sub nom. Gulf Coast Cable Television Co. v. Affiliated Capital Corp.,* —— U.S. ——, 105 S.Ct. 1164, 84 L.Ed.2d 316 (1984); *Coastal States Mktg., Inc. v. Hunt,* 694 F.2d 1358, 1368–73 (5th Cir.1983); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.,* 438 F.2d 1286, 1296–98 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). *See generally* 1 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 203–04 (1978 & Supp. 1982). We find little support for the point, regardless of which branch of "sham" is asserted. *See generally Coastal States,* 694 F.2d at 1371 n. 42. Appellants have cited nothing in the record other than an allegation in their initial complaint that the defendants conspired to monopolize. *See* Record vol. 4, at 832–34. To the contrary, appellants conceded in their main brief that "[Yellow's] negotiations with respect to the subject exclusive concession agreement was [sic] undertaken at arm's length...." *Brief for Appellant Arrow* at 46; *Brief for Appellant Independents* at 45–46. Thus, while the existence or nonexistence of shamful conduct is generally a question of fact for the jury, *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530, 543 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), appellants have nonetheless failed to present enough evidence to survive Yellow's motion for summary judgment. *Cf. Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228–32 (7th Cir.1975) (holding that agreement of government official to petitioning entity's anticompetitive plan was insufficient to render the official a "co-conspirator" for purposes of undermining *Noerr-Pennington* immunity). *But cf. Duke & Co., Inc. v. Foerster,* 521 F.2d 1277, 1282 (3d Cir.1975) ("Where the complaint goes beyond mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the *Noerr-Pennington* doctrine is inapplicable.").

*Independent Taxi,* 760 F.2d at 612–3.

This court finds the reasoning in *Independent Taxi* to be fully applicable in dismissing plaintiffs' allegations of conspiracy to restrain competition. Despite extensive discovery, plaintiffs have failed to establish any facts which would indicate a conspiracy existed and can only continue to point to innocuous, unrelated facts as a basis for this charge. *See* Memorandum in Support of Defendants' Motion for Summary Judgment at pp. 20–24.

Accordingly, the court finds that defendants, like Beaufort County, are immune from federal antitrust liability. *Cf. Independent Taxi, Etc. v. Greater Houston, Etc.,* 760 F.2d 607, 613 (5th Cir.1985) (Goldberg, J.) (observing, in finding private defendants immune under the *Noerr-Pennington* doctrine, that "[i]t would be anomalous to hold on the one hand that government can contract with private entities to effectuate valid, albeit anticompetitive, policies, while holding on the other hand that private entities cannot petition government to participate in the public endeavor.").

## IV. PENDENT CLAIMS

■ The plaintiffs also seek to hold the defendants liable for violations of a Beaufort County ordinance and South Carolina Unfair Trade Practices Act. Defendant WMSC's counterclaim against plaintiffs alleges that Margaret Savage, while employed by WMSC, learned of a business opportunity of WMSC and that Ms. Savage, taking advantage of confidential information of WMSC known to her and while still in WMSC's employ, seized that business opportunity for herself. This court finds that these claims should be dismissed for lack of an independent basis of subject matter jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86

S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Federman v. Empire Fire and Marine Insurance Co.*, 597 F.2d 798, 809 (2d Cir.1979) ("Dismissal of the state claim is the recommended procedure ... in cases where the federal claim is disposed of prior to trial").

## V. CONCLUSIONS

For the foregoing reasons, it is

ORDERED, that defendants' motions for summary judgment as to plaintiffs' second amended complaint, excluding the pendent claims, be, and the same are hereby, granted. It is

ORDERED FURTHER, that plaintiffs' motion for partial summary judgment as to various allegations of their second amended complaint, excluding defendants' counterclaim, be, and the same are hereby, denied. It is

ORDERED FURTHER, that the plaintiffs' pendent claims and the defendants' pendent counterclaim be, and the same are hereby, dismissed without prejudice.

AND IT IS SO ORDERED.